**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE APPLICATION OF TOP MATRIX
HOLDINGS LTD FOR AN ORDER TO
TAKE DISCOVERY FOR USE IN A
FOREIGN PROCEEDING PURSUANT
TO 28 U.S.C. § 1782

Case No. 18 Misc. _____

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S *EX PARTE*
APPLICATION AND PETITION FOR AN ORDER TO CONDUCT DISCOVERY FOR
USE IN A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................1

I.   FACTUAL BACKGROUND ..................................................................................4

    A.   The Parties ...................................................................................................4

    B.   Petitioner Entrusted Credit Suisse with the Management of its Assets ................7

    C.   Credit Suisse Relationship Manager Convicted of Fraud, Forgery and
        Criminal Mismanagement ............................................................................8

    D.   FINMA Identifies Shortcomings in Credit Suisse's Control Mechanisms
        and Risk Management Related to Mr. Lescaudron's Fraudulent Scheme ............10

    E.   Swiss Authorities Conduct a Criminal Investigation and File Charges
        Against Credit Suisse ..................................................................................11

    F.   Credit Suisse is Responsible for the Mismanagement of Top Matrix's
        Investments ...............................................................................................12

    G.   Petitioner Reasonably Contemplates Litigation in Switzerland Against
        Credit Suisse to Recover its Losses ..............................................................15

    H.   Highly Material Information Regarding Credit Suisse's Breach of Duties
        is Located in the U.S. .................................................................................15

II.  ARGUMENT .......................................................................................................17

    A.   Legal Framework ......................................................................................17

    B.   Petitioner Satisfies The Statutory Requirements of 28 U.S.C. § 1782. ................19

        1.   Credit Suisse USA and Mr. Dougan Are "Found" In the Southern
            District of New York. ......................................................................19

        2.   The Discovery Sought is for Use in Foreign Proceedings. ......................22

        3.   Petitioner Is An "Interested Person." ...............................................24

    C.   All of the Discretionary Factors of Section 1782 Weigh In Favor of
        Permitting the Discovery Petitioner Seeks. ....................................................25

        1.   The First *Intel* Factor Favors Granting Discovery. ..................................25

        2.   The Second *Intel* Factor Favors Granting Discovery. ..............................26

        3.   The Third *Intel* Factor Favors Granting Discovery. ................................27

        4.   The Fourth *Intel* Factor Favors Granting Discovery. ...............................28

III. CONCLUSION ...................................................................................................29

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*In re Accent Delight Int'l Ltd.*,
   869 F.3d 121 (2d Cir. 2017) ................................................................. 24

*Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*,
   No. 11 CIV. 2232 NRB, 2011 WL 4965150 (S.D.N.Y. Oct. 19, 2011) ............................. 20

*In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*,
   121 F.3d 77 (2d Cir. 1997) ............................................................. 18, 28

*In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*,
   773 F.3d 456 (2d Cir. 2014) .......................................................... 23 n. 86

*In re Application of Imanagement Servs. Ltd.*,
   No. CIV.A. 05-2311(JAG), 2006 WL 547949 (D.N.J. Mar. 3, 2006) ................................. 27

*In re Application of OOO Promnesftstroy*,
   No. M 19-99(RJS), 2009 WL 3335608 (S.D.N.Y. Oct 15, 2009) ...................................... 26

*Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.*,
   No. 17-MC-00216(VEC), 2017 WL 3841874 (S.D.N.Y. Sept. 1, 2017) ............................... 20

*In re Bayer AG*,
   146 F.3d 188 (3d Cir. 1998) .................................................................. 28

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
   673 F.3d 76 (2d Cir. 2012) ........................................................ 18, 19, 23, 27

*Brautigam v. Priest*,
   No. 99-365-SLR, 2000 WL 291534 (D. Del. Mar. 2, 2000) ....................................... 20 n. 78

*Bravo Express Corp. v. Total Petrochemicals & Ref. U.S.*,
   613 F. App'x 319 (5th Cir. 2015) ............................................................ 23

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*,
   798 F.3d 113 (2d Cir. 2015) .......................................................... 22, 23, 24

*Chubb Ins. Co. of Europe SE v. Zurich Am. Ins. Co.*,
   No. 1:09-MC-0116, 2010 WL 411323 (N.D. Ohio Jan. 28, 2010) ................................... 23

*Cragnotti & Partners Capital Inv - Brazil S.A. v. Quintella*,
   No. 650075/2015, 2017 WL 728754 (Sup. Ct. Feb. 23, 2017) .................................... 20 n. 78

*In re Edelman*,
    295 F.3d 171 (2d Cir. 2002) ................................................................................. 19

*Euromepa S.A. v. R. Esmerian, Inc.*,
    51 F.3d 1095 (2d Cir. 1995) .......................................................................... 18, 26

*In re Ex Parte Application of Jommi*,
    No. C 13-80212 CRB(EDL), 2013 WL 6058201 (N.D. Cal. Nov. 15, 2013) ............. 23 n. 86

*In re Ex Parte Application of Kleimar N.V.*,
    220 F. Supp. 3d 517 (S.D.N.Y. 2016) ...................................................................... 21

*Matter of Fornaciari for Order to Take Discovery Pursuant to 28 U.S.C. §1782*,
    No. 17MC521, 2018 WL 679884 (S.D.N.Y. Jan. 29, 2018) .................................. 20

*In re Gianoli Aldunate*,
    3 F.3d 54 (2d Cir. 1993) ........................................................................................ 19

*Grupo Mex. SAB de CV v. SAS Asset Recovery, Ltd.*,
    821 F.3d 573 (5th Cir. 2016) ........................................................................ 21 n. 79

*In re Grynberg*,
    223 F. Supp. 3d 197 (S.D.N.Y. 2017) .......................................................... 23 n. 86

*Hertz Corp. v. Friend*,
    559 U.S. 77, 93 (2010) ................................................................................... 19, 20

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) ................................................................................... passim

*In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*, 466 F. Supp. 2d 1020 (N.D. Ill. 2006) ................................ 25

*In re Malev Hungarian Airlines*,
    964 F.2d 97 (2d Cir. 1992) ..................................................................................... 18

*Metro. Life Ins. Co. v. Bank One, N.A.*,
    No. CIV.A. 03-1882 SDW, 2012 WL 4464026 (D.N.J. Sept. 25, 2012) .................... 20 n. 78

*Minatec Fin. S.A.R.L. v. SI Group Inc.*,
    2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) ...................................................... 28

*In re Nat'l Century Fin. Enters. Inc.*,
    846 F. Supp. 2d 828 (S.D. Ohio 2012) ...................................................... 20 n. 78

*Poliseno v. Credit Suisse Sec. (USA), LLC*,
    No. CV-12-108-BLG-RFC, 2013 WL 1767951 (D. Mont. Apr. 24, 2013) ............ 20 n. 78

*In re Qualcomm Inc.*,
   162 F. Supp. 3d 1029 (N.D. Cal. 2016) ....................................................... 21 n. 79

*In re Republic of Kazakhstan for an Order Directing Discovery from Clyde & Co. LLP*
   *Pursuant to 28 U.S.C. sec. 1782*, 110 F. Supp. 3d 512 (S.D.N.Y. 2015) ............................... 22

*In re Republic of Ecuador*,
   Nos. C 11-80171, C 11-80172, 2011 WL 4434816 (N.D. Cal. Sep. 23, 2011) ............. 21 n. 79

*In re Servicio Pan Americano de Proteccion*,
   354 F. Supp. 2d 269 (S.D.N.Y. 2004)........................................................... 27

*Sterling Fed. Bank, F.S.B. v. Credit Suisse First Boston Corp.*,
   No. 07-C-2922, 2008 WL 4924926 (N.D. Ill. Nov. 14, 2008) .................................... 20 n. 78

*In re Super Vitaminas, S.A.*,
   No. 17-mc-80125-SVK, 2017 WL 5571037 (N.D. Cal. Nov. 20, 2017)...................... 21 n. 79

*In re TPK Touch Sols. (Xiamen) Inc.*,
   No. 16-mc-80193-DMR, 2016 WL 6804600 (N.D. Cal. Nov. 17, 2016).................... 21 n. 79

*Unclaimed Prop. Recovery Serv., Inc. v. Credit Suisse AG*,
   No. 12 CIV. 3290 PAC, 2013 WL 1777761 (S.D.N.Y. Apr. 25, 2013) ....................... 20 n. 78

*Weber v. Finker*,
   554 F.3d 1379 (11th Cir. 2009) ................................................................. 23 n. 86

## Statutory Authorities

28 U.S.C. § 1782.................................................................................................. passim

Top Matrix Holdings Ltd. ("Top Matrix" or "Petitioner"), respectfully submits this Memorandum of Law in support of its Application and Petition pursuant to 28 U.S.C. § 1782 (the "Application") for an order authorizing it to obtain limited discovery from Credit Suisse Holdings (USA) Inc., Credit Suisse (USA) Inc., Credit Suisse Securities (USA) LLC, and Credit Suisse Asset Management, LLC (collectively "Credit Suisse USA") and Mr. Brady W. Dougan ("Dougan"), in the form of the attached subpoena *duces tecum* and subpoena *ad testificandum* (the "Subpoenas").[1]

## PRELIMINARY STATEMENT

This Application arises from the mismanagement of Petitioner's investments and accounts by Credit Suisse AG ("Credit Suisse" or "the Bank") stemming from its failure to prevent, supervise, and detect the fraudulent scheme perpetrated by a former Credit Suisse banker named Patrice Lescaudron ("Lescaudron").  The Bank not only failed to adequately supervise Lescaudron but also failed to adequately inform and warn Petitioner of the risks associated with certain investments, violated conflicts of interest rules, and failed to provide prompt notice and adequate documentation once it discovered Lescaudron's scheme.  Due to Credit Suisse's failures, Petitioner has suffered nine-digit losses.

Recent actions by Swiss authorities confirm Credit Suisse's wrongdoing.  *First*, Lescaudron was convicted and sentenced to five years in prison for forgery of documents, criminal mismanagement and fraud, including for conduct related to Petitioner's accounts

---

[1]  The Subpoenas are attached as Exhibit 2 and Exhibit 3 to the Declaration of Peter Calamari, dated October 9, 2018 ("Calamari Decl.").

1

at Credit Suisse, earlier this year.  *Second*, the Swiss Financial Market Supervisory Authority FINMA ("FINMA") concluded its investigation and enforcement proceeding against Credit Suisse for its wrongdoing and failures associated with Lescaudron's fraudulent scheme and condemned Credit Suisse's "*organisational deficiences*" and the "*lack of effective corrective intervention.*"

These developments mark yet another chapter in a long history of organizational deficiencies and lack of risk management at Credit Suisse.  Since the outbreak of the financial crisis of 2008, Credit Suisse has been at the center of multiple international investigations that involved conduct in the United States, and has agreed to pay substantial fines and settlements for that conduct, including for the bank's involvement in (i) a conspiracy to fix prices and limit competition in the market for credit default swaps,[2] (ii) the sales of residential mortgage-backed securities ("RMBS") in the run-up to the 2008 financial crisis,[3] (iii) a global tax evasion scheme,[4] (iv) a corruption probe into its hiring practices in the Asia Pacific region between 2007 and 2013,[5] (v) misrepresenting to investors the amount of new net assets in the U.S.,[6] and (vi) fraudulent practices in its retail

---

[2]   Twelve major banks, including Credit Suisse, agreed to pay US$ 1.865 billion in the credit default swap conspiracy.  Calamari Decl. at ¶ 40, Ex. 52 (Financial Times, *Wall Street Banks to Settle CDS lawsuit for $1.9bn*, Sept. 11, 2015).
[3]   Credit Suisse agreed to pay US$ 5.3 billion in 2016 for its conduct relating to mortgage-backed securities fraud. Calamari Decl. at ¶ 40, Ex. 53 (Press Release, U.S Dep't of Justice, *Credit Suisse Agrees to Pay $5.28 Billion in Connection with its Sale of Residential Mortgage-Backed Securities*, Jan. 18, 2017).
[4]   Credit Suisse agreed to pay US$ 2.6 billion for its tax evasion scheme. Calamari Decl. at ¶ 40, Ex. 54 (Press Release, U.S Dep't of Justice, *Credit Suisse Pleads Guilty to Conspiracy to Aid and Assist U.S. Taxpayers in Filing False Returns*, May 19, 2014).
[5]   Credit Suisse agreed to pay about US$ 47 million to resolve a U.S. Department of Justice corruption probe into its hiring practies in the Asia Pacific region between 2007 and 2013, and another US$ 30 million to settle a relevant civil charge by the U.S. Securities and Exchange Commission (SEC). Calamari Decl. at ¶ 40, Ex. 55 (Jon Hill, Law360, *Credit Suisse To Pay SEC $30M Over Asia Hiring Practices*, July 5, 2018).
[6]   Credit Suisse misrepresented assets in 2011 and 2012 in order to meet certain targets set by senior

execution services business.[7]  As part of its consent order and relevant settlements with the U.S. Department of Justice in the tax evasion case and the RMBS case, Credit Suisse agreed to appoint New York-based lawyer Neil Barofsky as U.S. monitor to report on whether the bank implemented adequate internal controls.[8]  Credit Suisse is also facing a lawsuit brought by the New York State Attorney General for deceiving investors about the risk evaluations of loans underlying RMBS sold in 2006 and 2007.[9]

Petitioner reasonably contemplates filing a lawsuit in the Swiss Courts seeking damages from Credit Suisse ("Swiss Litigation").  Credit Suisse USA is in possession and control of information highly material to the Swiss Litigation.  Petitioner brings this Application to obtain discovery in aid of that contemplated proceeding.

This Application meets all of the requirements of Section 1782.  Credit Suisse USA "resides or is found" in this District because (i) it maintains its principal place of business here, and (ii) has had systematic and continuous operations in New York for decades.  Mr. Dougan is "found" in this District because he is employed and conducts business here.  The discovery sought by the Petitioner is relevant to the issues at stake in the Swiss Litigation.  Each of the discretionary factors laid down by the Supreme Court in the Supreme Court's

---

management and as a result paid a US$ 90 million fine. Calamari Decl. at ¶ 40,  Ex. 90 (Finews.asia, *Credit Suisse Admits to Cooking U.S. Assets, Pay $90 Million Fine*, Oct. 6, 2016).

[7]  Credit Suisse agreed to pay US$ 10 million to New York state and the SEC to settle a probe into fraudulent practices in its retail execution services business. Calamari Decl. at ¶ 4,  Ex. 79 (Bob Van Voris, *Credit Suisse to Pay $10 Million to Settle Trading Claims*, Bloomberg, Sept. 28, 2018).

[8]  Calamari Decl. at ¶ 40, Ex. 87 (John Letzing, *Credit Suisse Tardiness Likely to Extend Monitors Sojourn,* Wall. St. J., Jan. 6, 2016), Ex. 56 (John Letzing & Christopher M. Matthews, *Credit Suisse Monitor Neil Barofsky Does Job With Gusto,* Wall. St. J., Apr. 30, 2015), Ex. 57 (RMBS Monitor FAQs, http://creditsuisse.rmbsmonitor.com/faqs) (stating that Neil Barofksy, as monitor, would oversee Credit Suisse's obligation to provide $2.8 billion in consumer relief and ultimately certify whether Credit Suisse has fulfilled its end of the Settlement Agreement).

[9]  Calamari Decl. at ¶ 40,  Ex. 58 (Robert Barba, *Ruling Narrows Use of Martin Act in Credit Suisse Case*, Wall. St. J., June 12, 2018).

*Intel* decision also favor the discovery sought by Petitioner. Petitioner therefore respectfully requests that the Court grant Petitioner's Application and permit Petitioner to serve the Subpoenas on Credit Suisse USA and Mr. Dougan.

## I.  FACTUAL BACKGROUND

### A.  The Parties

**Top Matrix Holdings Ltd.** is a company formed under the laws of the British Virgin Islands.[10] At the relevant time, Top Matrix's beneficiary was Mr. Vitaly Malkin ("Malkin").[11] Top Matrix was established by Credit Suisse on January 4, 2005, in the context of Credit Suisse setting up a trust and offshore company structure for Mr. Malkin.

**Mr. Malkin** is a Russian, Israeli, and Cypriot citizen and a resident of Monaco. He has a PhD in applied physics. From 2004 to 2013, he was a senator in the Russian Federation Council. Mr. Malkin is a successful businessman and investor.[12]

**Credit Suisse** is a multinational investment bank and financial services holding company, based in Zurich, Switzerland and with a strong presence in the United States. Credit Suisse has four divisions: investment banking, private banking, asset management, and shared services that provides marketing and support to the other three divisions. The bank has "a global reach with operations in about 50 countries and 46,840 employees from over 170 different nations."[13] Credit Suisse is the second largest bank in Switzerland.[14]

---

[10]  Calamari Decl. at ¶ 8, Ex.80 (Articles of Association), Ex. 81 (Certificate of Incorporation), Ex. 82 (Certificate of Incumbency).
[11]  Calamari Decl. at ¶ 8, Ex. 4 (Beneficial Ownership Certification, 2013).
[12]  Calamari Decl. at ¶ 9, Ex. 5.
[13]  Calamari Decl. at ¶ 10, Ex. 6.
[14]  Calamari Decl. at ¶ 10, Ex. 89 (Brenna Hughes Neghaiwi, *Credit Suisse Banks on Wealth Management Growth As Profit Doubles*, Reuters, July 31, 2018).

***Credit Suisse Holdings (USA), Inc.*** is a holding company, which through its subsidiaries, offers commercial banking services.  Credit Suisse Holdings (USA), Inc. was formerly known as Credit Suisse First Boston, Inc. and changed its name to Credit Suisse Holdings (USA), Inc. in February, 1997.  It is a Delaware company with its principal place of business at 11 Madison Ave, New York.  Credit Suisse Holdings (USA), Inc. operates as a subsidiary of Credit Suisse.[15]

***Credit Suisse (USA), Inc.*** provides various financial and banking services in the United States.  The company offers various investment solutions, including alternative investments, such as private equity, hedge funds, real estate, and commodities; discretionary managed portfolios; equities; fixed income; foreign exchange; lending; managed accounts; and structured notes.  Credit Suisse (USA), Inc., founded in 1959, is a Delaware company with its principal place of business at 11 Madison Ave, New York.[16]

***Credit Suisse Securities (USA) LLC*** operates as an investment bank in the United States.  Its businesses include securities underwriting, sales and trading, investment banking, private equity, alternative assets, financial advisory services, investment research, and asset management.  The company offers services in investment banking, capital markets, and financial services segments for institutional, corporate, government, and high net worth clients.  Credit Suisse Securities (USA) LLC was formerly known as Credit Suisse First Boston Corporation.  The company was formed in 1997 and is based at 11

---

[15]  Calamari Decl. at ¶ 11, Ex. 7. Credit Suisse AG is a subsidiary of Credit Suisse Group AG. *Id.*; *see also* Calamari Decl., Ex. 88.
[16]  Calamari Decl. at ¶ 12, Ex. 8.

Madison Avenue in New York, New York.  Credit Suisse Securities (USA) LLC operates as a subsidiary of Credit Suisse (USA), Inc.[17]

**Credit Suisse Asset Management, LLC** is a privately owned investment manager based in New York City that provides its services to high net worth individuals, charitable organizations, governments and governmental agencies, supranational organizations, public and private pension plans, sovereign wealth funds, corporations, registered investment companies and private funds.[18]  Credit Suisse Asset Management LLC operates as a subsidiary of CSAM Americas Holding Corp.[19]

**Mr. Dougan** served as the Chief Executive Officer (CEO) and Member of Executive Board at Credit Suisse Group AG and Credit Suisse AG from May 2007 to June 30, 2015, i.e. during the relevant period of time for the Swiss Litigation.[20]  Mr. Dougan currently serves as the Managing Partner at Scepter Partners, a private equity firm specializing in acquisitions of off-market large cap assets with a focus on financial services, natural resources, infrastructure, real estate and media and telecommunications.[21] Mr. Dougan currently works at Scepter Partners' New York office and resides in Greenwich, Connecticut.[22]

---

[17]  Calamari Decl. at ¶ 13, Ex. 9.
[18]  Calamari Decl. at ¶ 14, Ex. 10.
[19]  *Id.*  CSAM Americas Holding Corp. operates as a subsidiary of Credit Suisse (USA), Inc. *Id.*
[20]  Calamari Decl. at ¶ 15, Exs. 11, 12.
[21]  Calamari Decl. at ¶ 15, Exs. 13, 14.
[22]  Calamari Decl. at ¶ 15, Exs. 15, 16.

### B.     Petitioner Entrusted Credit Suisse with the Management of its Assets

Towards the end of 2004, the Petitioner's beneficiary, Mr. Malkin, and his then business partner Mr. Bidsina Ivanishvili ("Ivanishvili"), who from 2012 until 2013 was Prime Minister of Georgia, sold their shares in two companies that they helped establish.[23] Both then entrusted the Russian Desk at Credit Suisse's branch office in Geneva, Switzerland ("Credit Suisse Geneva") with the management of the proceeds of the sale. Petitioner entrusted approximately US$ 700 million with Credit Suisse Geneva.[24]

Credit Suisse set up a trust and offshore company structure for Mr. Malkin, including Top Matrix, which was established on January 4, 2005.[25] Credit Suisse Trust Limited ("CSTL"), based in Singapore, was appointed as trustee.[26] Around March 10, 2005, an account for Top Matrix was opened with Credit Suisse.[27] Bank of New York, New York acted as the intermediary bank in a number of transactions involving the trust.[28]

Top Matrix and Credit Suisse entered into "Discretionary Portfolio Management Agreements" and agreed on investment profiles for Top Matrix in March and April 2005.[29] According to these "Discretionary Portfolio Management Agreements," Top Matrix authorized Credit Suisse to independently manage the portfolio according to Top Matrix's

---

[23]  Calamari Decl. at ¶ 16, Ex. 17 at 2 (Malkin H'rg Minutes, Apr. 14, 2016).
[24]  *Id.*
[25]  Calamari Decl. at ¶ 17, Ex. 80 (Articles of Association), Ex. 81 (Certificate of Incorporation), Ex. 82 (Certificate of Incumbency).
[26]  Calamari Decl. at ¶ 17, Ex. 19 (Schedule of Fees for Trustee and Company Services, Feb. 7, 2005).
[27]  Calamari Decl. at ¶ 17,  Ex. 20 (Contract for the opening of the account).
[28]  Calamari Decl. at ¶ 17,  Exs. 21-22 (Notices of Withdrawal/Transfer), Ex. 23 (Payment Order via Intermediary Bank Bank of New York, New York).
[29]   Calamari Decl. at ¶ 18, Ex. 24 (Discretionary Portfolio Mgmt. Agreements & Investment Profiles).

investment profile, and the Swiss Bankers Association's Portfolio Management Guidelines.[30]

As a significant client of Credit Suisse, the Petitioner's accounts and investments should have been monitored by the Bank's senior management; indeed, Mr. Malkin met at least once with the former CEO of Credit Suisse, Mr. Dougan, to discuss Mr. Malkin's needs, investment portfolio, and overall relationship with the bank.[31]  Petitioner's accounts and relationship with the Bank continue through today.

### C.    Credit Suisse Relationship Manager Convicted of Fraud, Forgery and Criminal Mismanagement

Mr. Lescuadron succeeded Mrs. Daria Mihaesco Krassiakov, who had been the Relationship Manager when Petitioner's beneficiary Mr. Malkin and Mr. Ivanishivili joined the Bank as clients in late 2004 and set up their accounts.[32]  From around September 2006 to 2015, Mr. Lescaudron became the Relationship Manager at Credit Suisse Geneva's Russia Desk and was given responsibility for a number of wealthy Eastern European private clients, including Petitioner's beneficiary Mr. Malkin, and Mr. Ivanishvili.  Mr. Lescaudron had approximately US$ 2.5 billion in assets under management, with half of those assets belonging to Petitioner's beneficiary Mr. Malkin, or Mr. Ivanishvili.[33]

At or around the end of 2015, it was gradually revealed that Mr. Lescaudron masterminded a fraudulent scheme spanning many years to falsify trades and distribute

---

[30]  *Id.*
[31]  Calamari Decl. at ¶ 19, Ex. 25 at 7 (Lescaudron H'rg Minutes, Nov. 11, 2016).
[32]  Calamari Decl. at ¶ 21, Ex. 27 at 3, Ex. 28 (Lescaudron H'rg Minutes, Jan. 18, 2016).
[33]  Calamari Decl. at ¶ 20, Ex. 25 at 3, Ex. 26 (Lescaudron H'rg Minutes, Nov. 11, 2016).

false statements to conceal mounting losses.[34]  Many clients at Credit Suisse Geneva's Russia Desk, including Petitioner and Mr. Ivanishvili, suffered substantial losses and damages due to Mr. Lescaudron's criminal scheme and seek to hold Credit Suisse liable for those losses.

In September 2015, Credit Suisse launched an internal investigation into Mr. Lescaudron's investments and his conduct at the bank.[35]  In an investigatory interview on September 14, 2015, Mr. Lescaudron admitted to trading without clients' authorization, purchasing investments at higher-than-agreed quantities, and by submitting fabricated statements to clients to disguise losses.[36]  Upon information and belief, Credit Suisse dismissed Mr. Lescaudron on September 22, 2015.[37]

In December 2015, Credit Suisse brought criminal charges against Mr. Lescaudron alleging fraud, forgery and criminal mismanagement.[38]  On March 9, 2016, Top Matrix joined the criminal proceeding[39] and was later formally recognized by the Swiss Prosecutor's office as a "Complainant" in the criminal proceedings.[40]  On June 26, 2017, Mr. Lescaudron was formally charged for fraud, forgery and criminal mismanagement.[41] On February 9, 2018, the Geneva Criminal Court sentenced Mr. Lescaudron to five years

---

[34]  Calamari Decl. at ¶ 22, Ex. 29 (Stephanie Nebehay and Brenna Neghaiwi, *Former Credit Suisse "Star" Gets Five Years in Jail for "Clever Fraud"*, Reuters (Feb. 9, 2018)).  Lescaudron lived lavishly off his ill-gotten wealth, amassing 32 million Swiss Francs and purchasing houses in Switzerland and Italy as well as luxury sports cars. *Id.*
[35]  Calamari Decl. at ¶ 23, Ex. 30 at 1, Ex. 31 (Lescaudron Decl., Sept. 18, 2015).
[36]  Calamari Decl. at ¶ 23, Ex. 30 at 3-5, Ex. 31 (Lescaudron Decl., Sept. 18, 2015).
[37]  Calamari Decl. at ¶ 23, Ex. 27 at 16, Ex. 28 (Lescaudron H'rg Minutes, Jan. 18, 2016).
[38]  Calamari Decl. at ¶ 24, Ex. 32 at ¶ 27, Ex. 33 (Credit Suisse Crim. Compl., Dec. 23, 2015).
[39]  Calamari Decl. at ¶ 24, Exs. 34, 35 (TMH Crim. Compl., Mar. 9, 2016).
[40]  Calamari Decl. at ¶ 24, Ex. 36 at 2, Ex. 37 (Ordinance, Apr. 8, 2016).
[41]  Calamari Decl. at ¶ 24, Ex. 38 at 2, 7, 9, Ex. 39 (Formal Charge, June 26, 2017).

in prison and a four-year ban from banking, and ordered him to pay damages of approximately US$ 130 million.[42]

Remarkably, Credit Suisse has now appealed against Mr. Lescaudron's conviction and asked the court to acquit Mr. Lesacuadron of the charge of criminal mismangement, even though Credit Suisse originally brought the charges and specifically included the charge of criminal mismanagement in its initial complaint against Mr. Lescaudron.[43]

### D. FINMA Identifies Shortcomings in Credit Suisse's Control Mechanisms and Risk Management Related to Mr. Lescaudron's Fraudulent Scheme

On September 17, 2018, the Swiss Financial Market Supervisory Authority issued a press release summarizing the conclusions of its enforcement proceedings against Credit Suisse for the bank's role in Mr. Lescaudron's fraudulent activities ("FINMA Press Release").[44]  FINMA identified deficiencies in the anti-money laundering process, as well as shortcomings in the Bank's control mechanisms and risk management based on Mr. Lescaudron's fraudulent activities to the detriment of Mr. Ivanishvili and other clients of the bank, such as the Petitioner.[45]

FINMA identified that the "Lescaudron case" revealed glaring weaknesses in the Bank's organization and risk management. FINMA found that the Bank had failed to

---

[42]  Calamari Decl. at ¶ 24, Ex. 40 at 187-88, Ex. 41 (Judgment of Tribunal, Feb. 9, 2018).
[43]  The only plausible explanation why Credit Suisse would appeal Lescaudron's conviction is that Credit Suisse has become aware that a conviction on the count of criminal mismanagement further increases Credit Suisse's civil liability. Calamari Decl. at ¶ 24, Ex. 42 (Hugo Miller, *Credit Suisse Gives Rogue Banker Unlikely Boost in Appeal*, Bloomberg, June 29, 2018).
[44]  Calamari Decl. at ¶ 25, Exs. 43 (FINMA Press Release).
[45]  Calamari Decl. at ¶ 25, Exs. 44 (Jan-Henrik Förster & Hugo Miller, *Credit Suisse Scolded for Failing to Rein in Rogue Banker*, Bloomberg, Sept. 17, 2018).

adequately record, contain and monitor the risks from the business relationship of wealthy Eastern European clients, including Mr. Malkin, and the responsible client relationship manager at Credit Suisse Geneva's Russia Desk (i.e. Mr. Lescaudron).[46]

FINMA found that Credit Suisse exhibited both organisational deficiencies (in terms of allocation of responsibilities, supervision and control) and a lack of effective corrective intervention.[47]  Given the significance of Credit Suisse's business relationship to these wealthy Eastern Europe clients and the associated risks, the bank's risk management was not appropriate in this instance.[48]  FINMA will appoint an independent third party to review the implementation of these measures.[49]

### E.   Swiss Authorities Conduct a Criminal Investigation and File Charges Against Credit Suisse

Several other damaged clients brought formal charges against Credit Suisse before the Prosecutor's Office in Geneva in connection with Credit Suisse's wrongdoings and failures in the context of Mr. Lescaudron's fraudulent activities.[50]  Upon information and belief, investigations by the Prosecutor's Office in Geneva are currently pending against Credit Suisse and several further Credit Suisse employees.[51]

The Prosecutor's Office in Geneva is conducting a criminal investigation against two former Credit Suisse, Geneva branch employees in a case involving wealthy Turkish

---

[46] Calamari Decl. at ¶ 26.
[47] Calamari Decl. at ¶ 27 & Ex. 43.
[48] Calamari Decl. at ¶ 27.
[49] Calamari Decl. at ¶ 28.
[50] Calamari Decl. at ¶ 30, Exs. 46, 47.
[51] Decurtins Decl. at ¶ 10.

clients and against representatives of a Geneva-based external asset manager allegedly affiliated with Credit Suisse.[52]

### F.    Credit Suisse is Responsible for the Mismanagement of Top Matrix's Investments

Credit Suisse Geneva's Russia Desk were plagued by deficient organization, a lack of risk management and grave breaches of duties owed to Credit Suisse's clients.  Indeed, Mr. Lescaudron was not the banker he made his clients believe he was; before joining Credit Suisse in December 2004, Mr. Lescaudron had never worked in banking, let alone private banking.[53]  He joined with his only previous experience being a director for the cosmetics company Yves Rocher in Russia.[54]

More generally, Credit Suisse, and Credit Suisse Geneva's Russia Desk in particular, breached several of its duties under applicable laws and regulations, including FINMA regulations and Swiss Banking Association guidelines by:

*Failing to prevent and detect Mr. Lescaudron's fraudulent scheme:* Credit Suisse failed to implement adequate monitoring, risk management and supervisory processes to prevent and detect Mr. Lescaudron's fraudulent scheme.[55]  As identified in the FINMA Press Release, Mr. Lescaudron—who had a about $2.5 billion in assets under management—repeatedly breached the bank's compliance regulations over a number of years.  Instead of sanctioning Mr. Lescaudron, Credit Suisse rewarded him with positive

---

[52]  Calamari Decl. at ¶ 31, Ex. 48 (Hugo Miller, *Ex-Credit Suisse Banker Charged in Turkish Client Probe*, Bloomberg, July 27, 2017).
[53]  Calamari Decl. at ¶ 32, Ex. 27 at 3, Ex. 28 (Lescaudron H'rg Minutes, Jan. 18, 2016).
[54]  Calamari Decl. at ¶ 32, Ex. 27 at 3, Ex. 28 (Lescaudron H'rg Minutes, Jan. 18, 2016).
[55]  Decurtins Decl. at ¶ 7.

reviews, and excessive compensation and benefits while remaining unsupervised.[56]  Had Credit Suisse fulfilled its duties, Mr. Lescaudron would not likely have been able to perpetrate his fraudulent scheme to the detriment of many clients including Top Matrix.

*Failing to meet its information and warning duties in connection with high risk financial products:* Credit Suisse also failed to meet its information and warning duties towards Petitioner concerning the risks associated with certain high risk financial products, including seven high-risk financial products that were sold to Petitioner during the run up to the 2008 financial crisis, between May 28, 2008 and September 16, 2008 ("Selected High-Risk Financial Products").[57] *See* Appendix A (List of Selected High-Risk Financial Products).  An affiliated entity of Credit Suisse issued two of those products ("Credit Suisse Certificates").  Petitioner has suffered nine-digit losses as a result.[58]

*Violation of conflict of interest rules:*  Credit Suisse violated conflict of interest rules by simultaneously acting as issuer, broker, and paying agent in a number of products sold to Petitioner, including the Credit Suisse Certificates sold as part of the Selected High-Risk Financial Products.[59]

*Failure to provide prompt notice and complete banking documentation:*  Credit Suisse also failed to provide Petitioner with prompt notice of any potential issues in relation to their investments.[60]  For example, Credit Suisse did not detect that Mr. Lescaudron had

---

[56]  Calamari Decl. at ¶ 33.
[57]  Decurtins Decl. at ¶ 7.
[58]  Decurtins Decl. at ¶ 7.
[59]  Decurtins Decl. at ¶ 8.
[60]  Decurtins Decl. at ¶ 9.

opened sub-accounts without proper authorization by the bank and by Petitioner.  In one instance, Mr. Lescaudron opened a sub-account labelled "Advisor IPO." Through the "Advisor IPO" account, Mr. Lescaudron conducted a multi-year scheme of unauthorized trades.[61]  While Credit Suisse should have monitored and should have been aware of Mr. Lescaudron's wrongdoing as it occurred, Credit Suisse became aware of the misconduct by September 2015 at the latest, yet waited until December 30, 2015 to inform Top Matrix of some (but not most, and certainly not all) of the account issues.[62]

Credit Suisse has also refused to provide Petitioner with all relevant documentation in connection to Petitioner's relationship with the Bank.  Indeed, Credit Suisse has selectively provided information that appears incomplete and at times inaccurate and misleading.[63]  For example, Credit Suisse alleged that "there are no records available on the client file with regards to any documents and communications relating to any meetings between Mr. Malkin and CEO Brady Dougan."[64]  However, based on Mr. Malkin's recollection and also as confirmed by Lescaudron, Mr. Malkin and Mr. Dougan met on at least one occasion and it seems highly implausible that no correspondence, calendar invite or other records exist as to that encounter. *See* Supra Section B.

---

[61]  Calamari Decl. at ¶ 28(e), Ex. 25 at 4, Ex. 26 (Lescaudron H'rg Minutes, Nov. 11, 2016).
[62]  Calamari Decl. at ¶ 28(e), Ex. 49 (Letter from Credit Suisse, Dec. 30, 2015).
[63]  Decurtins Decl. at ¶ 9.
[64]  Decurtins Decl. at ¶ 9; Calamari Decl., Exs. 50-51 (Letters from Credit Suisse, June 20, 2018).

### G. Petitioner Reasonably Contemplates Litigation in Switzerland Against Credit Suisse to Recover its Losses

Petitioner suffered hundreds of millions of dollars in damages due to Credit Suisse's repeated breaches set out above.  To this date, Credit Suisse has denied any knowledge of and responsibility for Mr. Lescaudron's wrongdoing and refused to compensate Petitioner (and its beneficiary, Mr. Malkin) for its losses.[65]  To recover its losses, Petitioner therefore will file a lawsuit against Credit Suisse in the Swiss Courts ("Swiss Litigation").  Top Matrix is currently finalizing its statement of claim in the Swiss Litigation,[66] and will allege that Credit Suisse breached numerous duties in connection with (1) Mr. Lescaudron's fraudulent scheme, and (2) high risk financial products sold to Petitioner.[67]

### H. Highly Material Information Regarding Credit Suisse's Breach of Duties is Located in the U.S.

Credit Suisse has significant operations and a strong presence in the State of New York through its wholly-owned subsidiaries, including Credit Suisse Holdings (USA), Inc., Credit Suisse (USA), Inc., Credit Suisse Securities (USA) LLC, and Credit Suisse Asset Management LLC.[68]  Credit Suisse's Investment Banking department is headquartered in New York and at least two Board members, as well as the bank's former CEO, Mr. Dougan, are U.S. citizens.[69]  Additionally, general inquiries relating to the bank's public disclosures

---

[65] Decurtins Decl. at ¶ 12.
[66] Decurtins Decl. at ¶ 15.
[67] Decurtins Decl. at ¶ 16.
[68] Calamari Decl. at ¶ 36.
[69] Calamari Decl. at ¶ 37-38, Exs. 68, 83.

and investor relations may be directed to the bank's New York offices.[70]  As a foreign private issuer trading American Depositary Shares on the New York Stock Exchange,[71] Credit Suisse files periodic reports with the U.S. Securities and Exchange Commission (the "SEC").[72]

Credit Suisse first disclosed the existence of Mr. Lescaudron's fraudulent scheme to U.S. investors in its 20-F filing on March 24, 2016, and in subsequent disclosures thereafter, including in its 20-F filings in 2017 and 2018.[73]  Credit Suisse USA's employees and in-house attorneys likely reviewed these disclosures and any relevant internal documents and reports.  And as a globally integrated bank, Credit Suisse has likely disseminated information about Mr. Lescaudron's scheme throughout its subsidiaries in the United States.[74]

In this context, Mr. Lescaudron's investments in shares listed on NASDAQ on behalf of Credit Suisse clients would have triggered relevant reporting requirements with the SEC.  In one instance, Mr. Lescaudron purchased more than 20% of the shares in the Raptor Pharmaceuticals on behalf of Mr. Ivanishvili, which led to relevant correspondence between Credit Suisse and the SEC.[75]

In addition, Mr. Dougan acted as the former CEO and Member of Executive Board at Credit Suisse Group AG and Credit Suisse AG during the relevant time period.[76]  Since

---

[70]  Calamari Decl. at ¶ 41, Ex. 59.
[71]  Calamari Decl. at ¶ 42, Ex. 60.
[72]  Calamari Decl. at ¶ 42, Ex. 76.
[73]  Calamari Decl. at ¶ 42, Ex. 45 at 382; Ex. 77 at 382; Ex. 78 at 381-382.
[74]  *See, e.g.,* Calamari Decl. at ¶ 43, Ex. 86; *see also id.,* Ex. 61 ("We combine our human capital with *a global presence spanning the Americas,* EMEA, and Asia.") (emphasis added).
[75]  Calamari Decl. at ¶ 42, Ex. 84 at 6,7 (Campà Filing, June 26, 2018), Ex. 85 (translation).
[76]  Calamari Decl. at ¶ 15, Exs. 11, 12.

Credit Suisse alleged that there are "no records available on the client file on meetings between Mr. Malkin and Mr. Dougan," Petitioner will need to ask Mr. Dougan about any relevant information on meetings with Mr. Malkin.  *See* supra Section B and E.

Thus, both Credit Suisse USA and Mr. Dougan are in possession and control of information highly material to the Swiss Litigation, which relates to Mr. Lescaudron's fraud; Credit Suisse's knowledge of Mr. Lescaudron's fraudulent activities; Credit Suisse's supervision, or lack thereof, of Mr. Lescaudron dealings with Petitioner's investments; Credit Suisse's failure to meet its information and warning duties concerning highly risky structured products sold to Petitioner; Credit Suisse's other breaches of its duties; and Credit Suisse's senior management's knowledge, including Mr. Dougan's knowledge, about these matters.

## II.    ARGUMENT

### A.    Legal Framework

Title 28 of the United States Code, Section 1782 ("Section 1782") permits United States District Courts to grant discovery for use in a pending or "reasonabl[y] contemplat[ed]" foreign proceeding.  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004).  The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person.

28 U.S.C. § 1782.

An application made pursuant to Section 1782 must satisfy three statutory requirements: "(1) the person from whom discovery is sought resides (or is found) in the

district of the district court to which the application is made, (2) the discovery is for use in

a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign

or international tribunal or any interested person." *Brandi-Dohrn v. IKB Deutsche

Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).

Having satisfied the three statutory requirements, courts must then consider four

discretionary factors: (1) whether the documents or testimony sought are within the foreign

tribunal's jurisdictional reach, and thus accessible absent Section 1782 aid; (2) the nature

of the foreign tribunal, the character of the proceedings underway abroad, and the

receptivity of the foreign government or the court or agency abroad to U.S. federal-court

judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent

foreign proof-gathering restrictions or other policies of a foreign country or the United

States; and (4) whether the subpoenas contain unduly intrusive or burdensome requests.

*See Intel*,542 U.S. at 264-65 (2004).

Moreover, courts in this circuit "evaluate discovery requests under Section 1782 in

light of the statute's 'twin aims of providing efficient means of assistance to participants

in international litigation in our federal courts and encouraging foreign countries by

example to provide similar means of assistance to our courts.'" *Euromepa S.A. v. R.

Esmerian*, Inc., 51 F.3d 1095, 1097 (2d Cir. 1995) (quoting *In re Malev Hungarian Airlines*,

964 F.2d 97, 99 (2d Cir. 1992)); *see In re Application for an Order Permitting

Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) (noting the twin

aims of Section 1782).  Courts have acknowledged a Congressional intent to provide a

liberal avenue to discovery in aid of foreign and international proceedings.  *See, e.g.*, *Intel*,

542 U.S. at 247-48 (describing the broadened scope of Section 1782 discovery); *Brandi-Dohrn*, 673 F.3d at 80 ("[T]he statute has, over the years, been given increasingly broad applicability." (citing *In re Gianoli Aldunate*, 3 F.3d 54, 57 (2d Cir. 1993))); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly . . . .").

**B.    Petitioner Satisfies The Statutory Requirements of 28 U.S.C. § 1782.**

Petitioner satisfies the three statutory requirements of section 1782: (1) Credit Suisse USA and Mr. Dougan are "found" in the Southern District of New York; (2) the requested information is "for use" in the Swiss Litigation; and (3) Petitioner is an "interested person" as the putative claimant in that foreign proceeding.

**1.    Credit Suisse USA and Mr. Dougan Are "Found" In the Southern District of New York.**

All of Credit Suisse USA entities maintain their principal place of business within this District and engage in the sort of systematic and continuous activities that courts have considered sufficient to allow a foreign corporation to be "found" in a district for purposes of Section 1782.  Mr. Dougan is Managing Partner of Scepter Partners' New York Office and conducts business in New York through that office.

***Credit Suisse USA Maintains Its Principal Place of Business Here.***  Credit Suisse USA is headquartered at 11 Madison Avenue, New York, New York,[77] where its officers "direct, control, and coordinate" Credit Suisse USA's activities.  *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010) (holding that principal place of business "should normally be the

---

[77]   Calamari Decl. at ¶ 36, Exs. 59, 62-70.

place where the corporation maintains its headquarters"). Courts in this District and elsewhere have found that Credit Suisse USA maintains its principal place of business in this District. *See Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*, No. 11 CIV. 2232 NRB, 2011 WL 4965150, at *1 (S.D.N.Y. Oct. 19, 2011) (noting that the "Credit Suisse corporate family" is "formed in Delaware with their principal places of business in New York").[78] Thus, Credit Suisse USA is "found" in this District for purposes of Section 1782. *Matter of Fornaciari for Order to Take Discovery Pursuant to 28 U.S.C. §1782*, No. 17MC521, 2018 WL 679884, at *2 (S.D.N.Y. Jan. 29, 2018) (noting that corporation is found in district where it is "essentially at home"); *Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.*, No. 17-MC-00216 (VEC), 2017 WL 3841874, at *3 (S.D.N.Y. Sept. 1, 2017) ("[A] corporation is "at home" for the purpose of constitutional due process only in a state that is the corporation's place of incorporation *or its principal place of business*." (quoting *Daimler* 761 n.19)) (emphasis added).

---

[78]   *See also Cragnotti & Partners Capital Inv - Brazil S.A. v. Quintella*, No. 650075/2015, 2017 WL 728754, at *4 (Sup. Ct. Feb. 23, 2017) ("Credit Suisse Holdings (USA), Inc., f/k/a Credit Suisse First Boston, Inc. is a Delaware corporation with its principal place of business in New York, New York. Accordingly, pursuant to CPLR 301, the New York courts have personal jurisdiction over Credit Suisse Holdings (USA), Inc., f/k/a Credit Suisse First Boston, Inc."); *Unclaimed Prop. Recovery Serv., Inc. v. Credit Suisse AG*, No. 12 CIV. 3290 PAC, 2013 WL 1777761, at *1 (S.D.N.Y. Apr. 25, 2013) ("[Credit Suisse Securities USA] is a New York citizen because the sole member of CSSU is Credit Suisse (USA), Inc., which has its principal place of business and corporate headquarters in New York"); *Poliseno v. Credit Suisse Sec. (USA), LLC*, No. CV-12-108-BLG-RFC, 2013 WL 1767951, at *2 (D. Mont. Apr. 24, 2013) (Credit Suisse (USA) maintains its principal place of business in New York.); *Brautigam v. Priest*, No. 99-365-SLR, 2000 WL 291534, at *3 (D. Del. Mar. 2, 2000) (Credit Suisse Asset Management, LLC maintains it its principal place of business in New York.); *In re Nat'l Century Fin. Enters., Inc.*, 846 F. Supp. 2d 828, 846 (S.D. Ohio 2012) (Credit Suisse Securities (USA) LLC has its principal place of business in New York); *Sterling Fed. Bank, F.S.B. v. Credit Suisse First Boston Corp.*, No. 07-C-2922, 2008 WL 4924926, at *1 (N.D. Ill. Nov. 14, 2008)(same); *Metro. Life Ins. Co. v. Bank One, N.A.*, No. CIV.A. 03-1882 SDW, 2012 WL 4464026, at *1 (D.N.J. Sept. 25, 2012) (same).

***Credit Suisse USA Engages In Systematic and Continuous Activities Here.***  While the Second Circuit has not yet provided a definitive construction of the term "found" under Section 1782 as applied to corporate entities, courts in this district have typically held that an entity is "found" in this district if it has a "systematic and continuous" presence in the Southern District of New York.  *See In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 521 (S.D.N.Y. 2016) (defendant that conducted "systematic and regular business" in New York was "found" in this district).[79]

As the North American headquarters for the Credit Suisse Group, Credit Suisse USA has, for over five decades, engaged in systematic and continuous activities in this District.[80]  Credit Suisse USA "provide[s] clients with a full range of investment banking services"[81] out of their headquarters located at 11 Madison Avenue, New York, New York. Credit Suisse USA has provided a variety of capital raising, market making, advisory and brokerage services, as well as asset management services out of its New York offices.[82] For example, it advised on a number of multi-billion dollar mergers and acquisitions,[83] and

---

[79]  Other Circuit courts take the same approach.  *See, e.g.*, *Grupo Mex. SAB de CV v. SAS Asset Recovery, Ltd.*, 821 F.3d 573, 575-76 (5th Cir. 2016) (Cayman Islands company "indisputably 'resides or is found in' the district" based on fact that it had office space and personnel there); *In re Super Vitaminas, S.A.*, No. 17-mc-80125-SVK, 2017 WL 5571037, at *2 (N.D. Cal. Nov. 20, 2017) (corporation "found" in district "because it maintains two offices in this [d]istrict"); *In re TPK Touch Sols. (Xiamen) Inc.*, No. 16-mc-80193-DMR, 2016 WL 6804600, at *2 (N.D. Cal. Nov. 17, 2016) (corporation "maintains an office in this district and is 'found' here for purposes of Section 1782"); *In re Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1036 (N.D. Cal. 2016) ("Through these in-district offices, [the corporations] conduct systematic and continuous local activities and thus may be found within the Northern District for the purposes of Section 1782.") (internal quotation marks omitted); *In re Republic of Ecuador*, Nos. C 11-80171, C 11-80172, 2011 WL 4434816, at *2 (N.D. Cal. Sep. 23, 2011) (corporation "found" in district because it "maintains an office … in this district").
[80]  Calamari Decl. Ex. 63.
[81]  Calamari Decl. Ex. 71.
[82]  Calamari Decl. Exs. 71-72.
[83]  *See e.g.* Calamari Decl. Exs. 73-75.

earlier this year underwrote a half a billion dollar-public listing of an American company on the New York Stock Exchange.[84]  Credit Suisse also trades American Depositary Shares on the New York Stock Exchange and files periodic reports with the SEC.[85]

*Mr. Dougan is Employed and Conducts Business Here.*  As the Managing Partner of Scepter Partners' New York Office, Mr. Dougan is engaged in "systematic and continuous" presence in this District and thus "found" here for purposes of Section 1782. *In re Republic of Kazakhstan for an Order Directing Discovery from Clyde & Co. LLP Pursuant to 28 U.S.C. sec. 1782*, 110 F. Supp. 3d 512, 515 (S.D.N.Y. 2015) ("Clyde & Co. LLP's partners' daily practice of law in this jurisdiction gives it the requisite 'systematic and continuous' presence to be 'found' here for purposes of section 1782.").

Credit Suisse USA and Mr. Dougan have had a significant, continuous presence in New York and thus are "found" in this District.

### 2.    The Discovery Sought is for Use in Foreign Proceedings.

The Petitioner is preparing to file is a "foreign proceeding" for purposes of Section 1782.  "Where an applicant has not yet initiated a foreign proceeding, discovery is available when the materials may help the applicant either to plead or to prove the anticipated claims. Indeed, the foreign proceeding need not be pending, so long as it is within "reasonable contemplation." *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 123 (2d Cir. 2015); *see also Intel*, 542 U.S. at 259 (foreign proceeding need not have

---

[84]   Calamari Decl. Ex. 74.
[85]   Calamari Decl. Exs. 60, 76.

actually commenced at the time when Section 1782 discovery is sought; it need only "be within reasonable contemplation.").

The applicant "must provide some objective indicium that the action is being contemplated ... [and] the proceedings cannot be merely speculative." *KPMG*, 798 at 123. Here, Petitioner's Swiss lawyer (Mr. Remo Decurtins) states that the statement of claim is being finalized for filing before the Swiss Courts, which is objective evidence that Petitioner's "foreign proceeding" is "within reasonable contemplation." *See* Decurtins Decl. at ¶ 15; *Bravo Express Corp. v. Total Petrochemicals & Ref. U.S.*, 613 F. App'x 319, 323 (5th Cir. 2015) (finding that the application was for use in a contemplated proceeding where Petitioner filed a "sworn affidavit" from his foreign lawyer that he had "already prepared" the complaint).

The Swiss Litigation qualifies as a proceeding in a "foreign or international tribunal" for purposes of Section 1782.  Indeed, numerous courts have found that proceedings before Swiss courts satisfy the requirements of Section 1782.  *Chubb Ins. Co. of Europe SE v. Zurich Am. Ins. Co.*, No. 1:09-MC-0116, 2010 WL 411323, at *6 (N.D. Ohio Jan. 28, 2010) (authorizing Section 1782 discovery for use before the Commercial Court of Zurich).[86]

Petitioner is not required to show that the information sought would be discoverable or admissible in the foreign proceedings.  *Brandi-Dohrn v. IKB Deutsche Industriebank*

---

[86] *See also In re Grynberg*, 223 F. Supp. 3d 197, 200–02 (S.D.N.Y. 2017) (finding that Swiss commercial proceedings is a foreign proceeding under Section 1782, but denying application on other grounds); *In re Ex Parte Application of Jommi*, No. C 13-80212 CRB (EDL), 2013 WL 6058201, at *1 (N.D. Cal. Nov. 15, 2013) (authorizing Section 1782 discovery for criminal proceeding in Switzerland); *In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 462 (2d Cir. 2014) (finding that Swiss criminal investigation was "exactly the type of proceeding that the statute [was] intended to reach"); *Weber v. Finker*, 554 F.3d 1379, 1381 (11th Cir. 2009) (same).

*AG*, 673 F.3d at 82 ("[A]s a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application.").  Rather, Petitioner only needs to show that they have "the *practical ability* . . . to place a beneficial document—or the information it contains—before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017).

Here, Petitioner plainly satisfies this requirement. The information sought in the Subpoenas is highly material to the Swiss Litigation because it relates to Lescaudron's fraud; Credit Suisse's knowledge of Mr. Lescaudron's fraudulent activities; Credit Suisse's supervision, or lack thereof, of Mr. Lescaudron dealings with Petitioner's investments; Credit Suisse's failure to meets it information and warning duties concerning highly risky structured products sold to Petitioner; Credit Suisse's other breaches of its duties; and Credit Suisse's senior management's knowledge, including Mr. Dougan's knowledge, about these matters—the very issues at stake in the Swiss Litigation. Decurtins Decl., at ¶17.

### 3.  Petitioner Is An "Interested Person."

Finally, Section 1782 requires persons seeking discovery to show that they possess a reasonable interest in the foreign proceedings.  While Section 1782 broadly covers those with the right to participate and submit evidence in foreign proceedings, *see KPMG*, 798 F.3d at 120, there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s] who may invoke § 1782." *Intel*, 542 U.S. at 256.

24

Petitioner will be a party to the Swiss Litigation and is therefore an "interested person" under Section 1782.

> **C.   All of the Discretionary Factors of Section 1782 Weigh In Favor of Permitting the Discovery Petitioner Seeks.**

Once the threshold requirements under section 1782 are met, the Court considers the four discretionary "*Intel* factors." *See supra* at 21. Each of these factors weighs in favor of granting the requested discovery here. *First*, Credit Suisse USA and Mr. Dougan will not be parties to the Swiss Litigation. *Second*, there is no reason to believe that Swiss Courts would be unreceptive to evidence obtained through Section 1782 discovery and indeed the case will be a fact-intensive proceeding to which the discovery sought is directly relevant. *Third*, Petitioner is acting in good faith and is not seeking to avoid any foreign restriction on gathering evidence. *Fourth*, the requests are carefully circumscribed and targeted to key questions in the Swiss Litigation so as to avoid undue burden on Credit Suisse USA and Mr. Dougan.

> **1.   The First *Intel* Factor Favors Granting Discovery.**

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding. "[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264. Here, neither Credit Suisse USA nor Mr. Dougan will be a party to the Swiss Litigation. Credit Suisse USA and the putative defendant in the Swiss Litigation—Credit Suisse AG—are separate legal entities. *In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*,

466 F. Supp. 2d 1020, 1031 (N.D. Ill. 2006) (finding that parent and subsidiary corporations are "two separate legal entities" and thus parent was not a "participant" of the foreign proceeding merely due to ownership of subsidiary).

### 2.    The Second *Intel* Factor Favors Granting Discovery.

Under the second *Intel* factor, this Court looks to whether the foreign tribunal would be receptive to evidence obtained through section 1782. *See In re Application of OOO Promnesftstroy*, No. M 19-99(RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct 15, 2009) (describing second factor as inquiring into whether the foreign proceeding would "*reject* evidence obtained with the aid of section 1782") (citation omitted). There is a strong presumption that the foreign tribunal will be receptive to evidence obtained in the United States. *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995) (holding that "[a]bsent specific directions to the contrary from a foreign forum, [Section 1782's] underlying policy should generally prompt district courts to provide some form of discovery assistance."). A court should deny discovery on the basis of lack of receptiveness only where it is provided with "*authoritative proof* that [the] foreign tribunal would reject evidence obtained with the aid of section 1782." *Id.* at 1100 (emphasis added).

Here, the Swiss Courts will be receptive to evidence obtained as a result of this Application.[87] In the Swiss Litigation, Petitioner will have the opportunity to present documents until the fact-finding stage of the proceedings is closed.[88]

---

[87] Decurtins Decl. ¶ 20.
[88] Decurtins Decl. ¶ 19.

Further, courts have determined that the receptivity of a foreign court to U.S. federal judicial assistance may be inferred from the existence of treaties that facilitate cooperation between the U.S. federal judiciary and the foreign jurisdiction.  *See In re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004) (foreign jurisdiction "has indicated its receptivity to federal judicial assistance by its signature of treaties facilitating such cooperation"); *In re Application of Imanagement Serv*s. Ltd., No. CIV.A. 05-2311(JAG), 2006 WL 547949, at *4 (D.N.J. Mar. 3, 2006) (same).  Switzerland has entered into such treaties with the United States.[89]

### 3.    The Third *Intel* Factor Favors Granting Discovery.

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265.  The *Intel* Court expressly rejected the notion that Section 1782 requires that the evidence be discoverable in the foreign proceeding itself; the specific documents or testimony discovered need not be admissible abroad. *See Brandi-Dohrn*, 673 F.3d at 82 ("While *Intel* concerned the *discoverability* of evidence in the foreign proceeding, we see no reason why it should not extend to the *admissibility* of evidence in the foreign proceeding.  As in *Intel*, there is no statutory basis for any admissibility requirement."); *see Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or

---

[89]   *See* Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (also known as the Hague Evidence Convention) (United States and Switzerland have both signed and ratified the convention); U.S.- Switzerland Treaty on Mutual Legal Assistance in Criminal Matters, entered into force January 23, 1977. 27 UST 2019, TIAS 8302.

traditions; such reasons that do not necessarily signal objection to aid from United States federal courts.").  Nor is there any requirement to exhaust one's remedies in the foreign court first.  *See In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) ("[A] 'quasi-exhaustion requirement,' finds no support in the plain language of the statute and runs counter to its express purposes.").

Here, there is no reason to believe that any of the discovery sought violates public policy. Petitioner does not seek customer account information, state secrets, or attorney-client communications—it merely seeks documents and communications that are in the possession of private parties regarding Petitioner's investments and Credit Suisse's dealing with those investments.  Switzerland does no have any law or public policy against such discovery. *See* Decurtins Decl. at ¶ 19.  Moreover, if Credit Suisse USA reasonably believes that any individual documents present such concerns, Petitioner is willing to consider accommodating such concerns, such as by stipulating to a protective order. *See, e.g. Minatec Fin. S.A.R.L. v. SI Group Inc.*, 2008 WL 3884374, at *1 (N.D.N.Y. Aug. 18, 2008) ("[T]he beauty of § 1782 is that it permits this Court to impose a protective order that would extinguish any concern that privileged, confidential, or proprietary information would be indecorously revealed.").

### 4.    The Fourth *Intel* Factor Favors Granting Discovery.

The fourth *Intel* factor looks to whether the requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265.  The standard is substantially the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure.  "The reference in § 1782 to the Federal Rules suggests that under ordinary circumstances the standards for

discovery under those rules should also apply when discovery is sought under the statute." *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998).  Here, the requests are narrowly tailored, temporally limited, and directly relevant to questions in the contemplated foreign proceedings.  Whatever burden respondents may incur by producing the requested discovery, it is both modest and proportionate given the circumstances.

## III.    CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court (a) grant the *Ex Parte* Application And Petition For An Order To Conduct Discovery; (b) enter the Proposed Order attached to the Calamari Declaration as Exhibit 1, (c) authorize Petitioner, pursuant to 28 U.S.C. § 1782, to serve the Subpoenas; and (d) grant any and all other relief to Petitioner as deemed just and proper.

Dated:  New York, NY
        October 9, 2018                     Respectfully submitted,

                                            /s/ Peter Calamari

                                            Peter Calamari
                                            Lucas V.M. Bento
                                            Alexander Wentworth-Ping
                                            petercalamari@quinnemanuel.com
                                            lucasbento@quinnemanuel.com
                                            alexanderwentorthping@quinnemanuel.com
                                            QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP
                                            51 MADISON AVENUE, FLOOR 22
                                            NEW YORK, NY 10010
                                            Telephone: (212) 849-7000
                                            Facsimile: (212) 849-7100

                                            *Attorneys for Petitioner*

# APPENDIX A

**List of Selected High-Risk Financial Products:**

1. BEST-OF TRACKER NOTE BNP PARIBAS ARBITRAGE ISSUANCE BV 2008-11.6.09 (EXP. 28.5.09) ON A BASKET OF SHS & ADR (XS0368123203)

2. BEST-OF TRACKER NOTE DEUTSCHE BANK AG, LONDON BRANCH 2008-11.6.09 (EXP. 28.5.09) ON A BASKET OF SHS & ADR (XS0368733456)

3. BEST-OF WORST-OF TRACKER DEUTSCHE BANK AG, LONDON BRANCH 2008-23.6.09 (EXP. 9.6.09) ON A BASKET OF SHS (XS0371021568)

4. BEST OF WORST OF TRACKER SGA SOCIETE GENERALE ACCEPTANCE NV 2008-23.6.09 (EXP. 9.6.09) ON A BASKET OF SHS (XS0370825464)

5. CERTIFICATE PLUS CREDIT SUISSE AG, LONDON BRANCH 2008-17.7.09 (EXP.  3.7.09) ON MULTI SHARES (CH0043878005)

6. CERTIFICATE PLUS CREDIT SUISSE AG, LONDON BRANCH 2008-29.7.09 (EXP.  13.7.09) ON MULTI SHARES (CH0044146139)

7. CERTIFICATE PLUS UNICREDIT BANK AG 2008-17.9.09 (EXP. 3.9.09) ON A BASKET OF SHS (DE00HV6DN18)